563 F.2d 512
 3 Media L. Rep. 1041
 Jeff TRACHTMAN, Individually and by his father, Gilbert M.
Trachtman, Plaintiffs-Appellants-Appellees,
v.
Irving ANKER, Individually and in his capacity as Chancellor
of New York City Public Schools, Sanford Gelernter,
Individually and as Administrator of Student Affairs, Office
of Student Affairs, Office of High Schools, Board of
Education of the City of New York, Gaspar Fabricante,
Individually and as Principal of Stuyvesant High School, and
James Regan, Isaiah Robinson, Stephan Aiello, Amelia Ashe,
Joseph Barkan, and Robert Christen, constituting the Board
of Education of the City of New York, Defendants-Appellees-Appellants.
 Nos. 989, 990, Dockets 77-7011, 77-7033.
 United States Court of Appeals,
Second Circuit.
 Argued March 31, 1977.
Decided Aug. 31, 1977.
 
 Martin M. Berger, Cooperating Atty., New York Civil Liberties Union, New York City (Berger, Kramer & Sugerman, New York City, on the brief), for plaintiffs-appellants-appellees.
 Carolyn E. Demarest, New York City (W. Bernard Richland, Corp. Counsel for the City of New York and Leonard Koerner, New York City, on the brief), for defendants-appellees-appellants.
 Before LUMBARD, MANSFIELD and GURFEIN, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 These are cross appeals from a judgment of the Southern District, Constance Baker Motley, Judge, entered on December 16, 1976, which enjoined defendants from restraining plaintiffs' attempts to distribute a sex questionnaire to eleventh and twelfth-grade students at Stuyvesant High School in New York City and to publish the results in the student publication, "The Stuyvesant Voice." Plaintiffs Jeff Trachtman, then a senior student at Stuyvesant and editor-in-chief of the "Voice,"[1] and his father, Gilbert M. Trachtman, appeal from so much of the court's decision that allows defendants to prohibit distribution of the questionnaire to ninth and tenth-grade students at Stuyvesant. Defendants, Chancellor of the New York City Public Schools and officials of the New York City school system, contend that the district court erred in holding that their prohibition of the distribution of the questionnaire to any students at Stuyvesant violated the First Amendment. We conclude that defendants' actions in prohibiting the proposed sexual survey did not violate any constitutional right of the plaintiffs; accordingly, the order of the district court is reversed insofar as it restrains defendants from prohibiting distribution of the questionnaire to eleventh and twelfth-grade students at Stuyvesant.
 
 
 2
 This controversy began when Jeff Trachtman and Robert Marks, a staff member of the "Voice," submitted a plan to survey the sexual attitudes of Stuyvesant students and publish the results in the "Voice" to the school's principal, defendant Fabricante. Initially, the plan contemplated oral interviews of a "cross section" of the student population to be conducted by a group of student researchers. Mr. Fabricante denied the students permission to conduct the survey and, on December 4, 1975, Marks wrote to defendant Gelernter, Administrator of Student Affairs, seeking approval of the project. Gelernter responded by letter, dated December 17, 1975, stating that the proposed survey could not be conducted.
 
 
 3
 The students sought review of Gelernter's decision by Chancellor Anker. By this time the focus of the proposed survey had shifted from oral interviews to a questionnaire. Thus, in their letter to Anker, dated December 24, 1975, Trachtman and Marks submitted for review a questionnaire consisting of twenty-five questions, which, they advised, was to be used as a means for obtaining information for an article on "Sexuality in Stuyvesant" to appear in the "Voice." The questions, which the district court described as "requiring rather personal and frank information about the student's sexual attitudes, preferences, knowledge and experience," covered such topics as pre-marital sex, contraception, homosexuality, masturbation and the extent of students' "sexual experience." The questionnaire included a proposed cover letter which described the nature and purpose of the survey; it stressed the importance of honest and open answers but advised the student that, "(y)ou are not required to answer any of the questions and if you feel particularly uncomfortable don't push yourself.
 
 
 4
 The students sought permission to distribute the questionnaire on school grounds on a random basis. The answers were to be returned anonymously and were to be kept "confidential." The students were to tabulate the results and publish them in an article in the "Voice," which would also attempt to interpret the results.
 
 
 5
 Having received no reply from Chancellor Anker, on January 13, 1976 Marks and Trachtman wrote to Harold Siegel, Secretary of the Board of Education, and requested approval of their plan. Siegel responded in a letter dated February 27, 1976, to which he attached the decision of the Board. The decision advised the students that the survey could not be conducted stating, "Freedom of the press must be affirmed; however no inquiry should invade the rights of other persons." The decision indicated that the type of survey proposed could be conducted only by professional researchers, with the consent of the students' parents. The decision noted that "(m)atters dealing with sexuality could have serious consequences for the well being of the individual," and pointed out that the students lacked the requisite expertise to conduct such a survey and that the survey proposed made no provision for parental consent and did not guarantee the anonymity of those who answered.
 
 
 6
 Mr. Siegel responded to a request for reconsideration by indicating that the Board believed that many students would be harmed if confronted with the questions propounded by the questionnaire.
 
 
 7
 Plaintiffs commenced this action on August 26, 1976, seeking declaratory and injunctive relief under 42 U.S.C. § 1983, on the ground that the defendants' actions in prohibiting the dissemination of the questionnaire and publication of its results violated the First Amendment.
 
 
 8
 At a hearing on plaintiffs' motion for a preliminary injunction on September 23, 1976, the court decided to consolidate the motion with trial on the merits. See Fed.R.Civ.P. 65(a)(2). Thereafter, the parties agreed that the court should decide the issues on the basis of affidavits. Accordingly, the district court's decision was based upon the briefs, and affidavits of the parties and their expert witnesses.
 
 
 9
 Judge Motley found that permission to distribute the questionnaire could be denied consistently with the First Amendment only if defendants could prove that "there is a strong possibility the distribution of the questionnaire would result in significant psychological harm to members of Stuyvesant High School." She found that the "thrust" of defendants' evidence was that many high school students were only beginning to develop sexual identities and that the questionnaire would force emotionally immature individuals to confront difficult issues prematurely and become "quite apprehensive or even unstable as a result of answering this questionnaire." The court found this argument convincing with respect to thirteen and fourteen year old students; however, as to older students, the court found the claims of potential emotional damage unconvincing and concluded that the psychological and educational benefits to be gained from distribution of the questionnaire to this group of students outweighed any potential harm. Accordingly, the court held that defendants could not prohibit the students from distributing the questionnaire to eleventh and twelfth-grade students and from publishing the results in the "Voice." The court also found that certain safeguards should guide distribution of the questionnaire and ordered that the students and school officials should negotiate a plan to implement distribution and to provide for "both confidential and public discussion groups for students who would like to talk with school personnel after the distribution of the survey and publication of the results in the Voice."
 
 
 10
 On appeal both parties agree that the defendants' restraint of the students' efforts to collect and disseminate information and ideas involves rights protected by the First Amendment. See Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); cf. Kleindienst v. Mandel, 408 U.S. 753, 762-63, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). Essentially, resolution of the issues here turns upon a narrow question: What was it necessary for the defendants to prove to justify the prohibition of the distribution of the questionnaire and did the defendants meet this burden of proof?
 
 
 11
 Our inquiry must begin with Tinker, where the Supreme Court stated:
 
 
 12
 The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the purpose of certain types of activities. Among those activities is personal intercommunication among the students. This is not only an inevitable part of the process of attending school; it is also an important part of the educational process. A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects . . ., if he does so without "materially and substantially interfer(ing) with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others. But conduct by the student, in class or out of it, which for any reason whether it stems from time, place, or type of behavior materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.
 
 
 13
 393 U.S. at 512-13, 89 S.Ct. at 739-40 (citations and footnotes omitted).
 
 
 14
 Essentially, the defendants' position is that the students here seek not only to communicate an idea but to utilize school facilities to solicit a response that will invade the rights of other students by subjecting them to psychological pressures which may engender significant emotional harm.[2] Plaintiffs do not question defendants' authority to protect the physical and psychological well being of students while they are on school grounds, see, e. g., Ginsberg v. New York, 390 U.S. 629, 640-41, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); Prince v. Massachusetts, 321 U.S. 158, 165, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Kampmeier v. Nyquist, 553 F.2d 296 (2d Cir. 1977); rather, they contend that defendants have not made a sufficient showing to justify infringement of the students' rights to speech and expression.[3]
 
 
 15
 In interpreting the standard laid down in Tinker, this court has held that in order to justify restraints on secondary school publications, which are to be distributed within the confines of school property, school officials must bear the burden of demonstrating "a reasonable basis for interference with student speech, and . . . courts will not rest content with officials bare allegation that such a basis existed." Eisner v. Stamford Board of Education, 440 F.2d 803, 810 (2d Cir. 1971).[4] At the same time, it is clear that school authorities need not wait for a potential harm to occur before taking protective action. See Tinker v. Des Moines Independent Community School District, supra, 393 U.S. at 514, 89 S.Ct. 733; Russo v. Central School District No. 1, Towns of Rush, 469 F.2d 623, 632 (2d Cir. 1972), cert. denied, 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391 (1973); Quarterman v. Byrd, 453 F.2d 54, 58-59 (4th Cir. 1971). Although this case involves a situation where the potential disruption is psychological rather than physical, Tinker and its progeny hold that the burden is on the school officials to demonstrate that there was reasonable cause to believe that distribution of the questionnaire would have caused significant psychological harm to some of the Stuyvesant students.[5]
 
 
 16
 In support of their argument that students confronted with the questionnaire could suffer serious emotional harm, defendants submitted affidavits from four experts in the fields of psychology and psychiatry. Florence Halpern, professor of psychology at the New York University School of Medicine, stated that many adolescents are anxious about the "whole area of sex" and that attempts to answer the questionnaire by such students "would be very likely" to create anxiety and feelings of self-doubt; further, she stated that there were almost certainly some students with a "brittle" sexual adjustment and that for "such adolescents, the questionnaire might well be the force that pushes them into a panic state or even a psychosis." She concluded that distribution of the questionnaire was a "potentially dangerous" act that was "likely to result in serious injury to at least some of the students."Dr. Aaron H. Esman, chief psychiatrist at the Jewish Board of Guardians (an organization providing mental health treatment to emotionally disturbed children) and an associate in psychiatry at the Columbia University College of Physicians and Surgeons, indicated that a number of the questions (particularly those dealing with homosexuality, masturbation, and "sexual experience") were "highly inappropriate," particularly for children ages twelve through fourteen; such questions, in Dr. Esman's opinion, were "likely to arouse considerable anxiety and tension," which "might well lead to serious emotional difficulties."
 
 
 17
 Vera S. Paster, a psychologist and assistant director of the Bureau of Child Guidance (the mental health agency for the New York City school system) asserted that there were a "large number" of high school students who would need help dealing with the anxiety reactions caused by confronting the questionnaire and that the proposed methodology of the survey would make it impossible to provide "back up support or protection" for such students.
 
 
 18
 Dr. Ingram Cohen, chief school psychiatrist of the Bureau of Child Guidance, indicated that there are wide discrepancies in the physical and psychological development of adolescent students, even among students of the same age. Dr. Cohen also pointed out that the survey made no provision for assistance to students who reacted adversely to it and concluded that it had a sufficient potential for harm to justify prohibiting its dissemination.
 
 
 19
 The record shows that the curriculum at Stuyvesant includes various courses on sex and sexuality and that professionally supervised peer-group discussions are sponsored by the school. The defendants have consistently treated the topic of sexuality as an important part of students' lives, which requires special treatment because of its sensitive nature. Thus, the school system has provided several courses on the physical and emotional aspects of sex; such courses are taught by teachers with special qualifications and administrative materials emphasize the sensitive nature of the topic.[6] Further, the Board has consistently taken the position that even professional researchers may not conduct "sexual surveys" of students without meeting certain specific requirements.[7]
 
 
 20
 Plaintiffs offered statements from five experts, including Gilbert Trachtman, who is a professor of educational psychology at New York University. Plaintiffs' experts questioned the possibility that any emotional harm could be caused by students' attempts to answer the questionnaire, pointed out that the survey might be of substantial benefit to many students, and expressed the opinion that "squelching" the survey could have deleterious effects. They indicated that the topics covered in the questionnaire are of normal interest to adolescents and are common subjects of conversation; further, some of these experts emphasized that students in Manhattan are bombarded with sexually explicit materials and that it was highly unlikely that any student could be harmed by answering the questionnaire. It is noteworthy, however, that at least two of plaintiffs' experts, one of whom was Gilbert Trachtman, recognized that there was some possibility that some students would suffer emotional damage as a result of answering the questionnaire.[8]
 
 
 21
 The district court evidently found that there was a "strong possibility" that distribution of the questionnaire would result in significant psychological harm to ninth and tenth-grade students at Stuyvesant. The court did not find that there was no possibility of harm to eleventh and twelfth-grade students; rather, it concluded that any harm was outweighed by psychological and educational benefits to be gained from the questionnaire's distribution. This observation is substantiated by the fact that the court ordered the parties to provide for "confidential and public discussion groups" for students who wished to talk with school personnel after the survey; apparently, this was in response to defendants' contention that the survey as proposed failed to make any provision for counseling students who were disturbed by the questionnaire.
 
 
 22
 In determining the constitutionality of restrictions on student expression such as are involved here, it is not the function of the courts to reevaluate the wisdom of the actions of state officials charged with protecting the health and welfare of public school students. The inquiry of the district court should have been limited to determining whether defendants had demonstrated a substantial basis for their conclusion that distribution of the questionnaire would result in significant harm to some Stuyvesant students. In this regard, we must keep in mind the repeated emphasis of the Supreme Court that,
 
 
 23
 Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities.
 
 
 24
 Goss v. Lopez, 419 U.S. 565, 578, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975), quoting Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). See Ingraham v. Wright, 430 U.S. 651, 680, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); Tinker v. Des Moines Independent Community School District, supra, 393 U.S. at 507, 89 S.Ct. 733; Buck v. Board of Education of the City of New York, 553 F.2d 315, 320 (2d Cir. 1977).
 
 
 25
 We believe that the school authorities did not act unreasonably in deciding that the proposed questionnaire should not be distributed because of the probability that it would result in psychological harm to some students. The district court found this to be so with respect to ninth and tenth-grade students. We see no reason why the conclusion of the defendants that this was also true of eleventh and twelfth-grade students was not within their competence. Although psychological diagnoses of the type involved here are by their nature difficult of precision, cf. Cruz v. Ward, 558 F.2d 659, 662 (2d Cir. 1977), we do not think defendants' inability to predict with certainty that a certain number of students in all grades would be harmed should mean that defendants are without power to protect students against a foreseen harm. We believe that the school authorities are sufficiently experienced and knowledgeable concerning these matters, which have been entrusted to them by the community; a federal court ought not impose its own views in such matters where there is a rational basis for the decisions and actions of the school authorities. See Eisner v. Stamford Board of Education, supra, 440 F.2d 810; Butts v. Dallas Independent School District, 436 F.2d 728, 732 (5th Cir. 1971). Their action here is not so much a curtailment of any First Amendment rights; it is principally a measure to protect the students committed to their care, who are compelled by law to attend the school, from peer contacts and pressures which may result in emotional disturbance to some of those students whose responses are sought. The First Amendment right to express one's views does not include the right to importune others to respond to questions when there is reason to believe that such importuning may result in harmful consequences.[9] Consequently where school authorities have reason to believe that harmful consequences might result to students, while they are on the school premises, from solicitation of answers to questions, then prohibition of such solicitation is not a violation of any constitutional rights of those who seek to solicit.
 
 
 26
 In sum, we conclude that the record established a substantial basis for defendants' belief that distribution of the questionnaire would result in significant emotional harm to a number of students throughout the Stuyvesant population. Accordingly, the judgment is reversed insofar as it restrains defendants from prohibiting distribution of the questionnaire to eleventh and twelfth-grade students at Stuyvesant and the case is remanded with instructions to dismiss the complaint.
 
 GURFEIN, Circuit Judge, concurring:
 
 27
 In view of Judge Mansfield's dissent, I would simply add to Judge Lumbard's persuasive opinion the following comments.
 
 
 28
 First, while the passing out of the several questionnaires might not provoke a breach of the peace, a blow to the psyche may do more permanent damage than a blow to the chin. "Invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." Tinker v. Des Moines School Dist., 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969).
 
 
 29
 Second, whether such a traumatic effect can be foreseen is the subject of dispute among recognized psychiatrists, as Judge Mansfield notes. I think such dispute is better resolved by professional educators than by federal judges even when they find the credentials of plaintiffs' experts "more impressive". This is not a case where there is no evidence to support the school officials.
 
 
 30
 Lastly, this is not a case involving "distribution of sexual material in school." It is, as Judge Lumbard states, a case that involves individual responses to various aspects of sex from the point of view of personal history, a matter different from the simple dissemination of reading matter dealing with sex, which the majority opinion does not purport to ban. See footnote 2. That deserves further emphasis in response to the dissenting opinion, lest the majority decision serve as an unintended precedent in derogation of First Amendment right.
 
 MANSFIELD, Circuit Judge (dissenting):
 
 31
 With due respect I must dissent for the reason that in my view the defendants have completely failed to sustain their burden of showing that they are justified in depriving plaintiffs of their First Amendment right to engage in constitutionally protected freedom of expression by distributing to students the questionnaire regarding sex attitudes.
 
 
 32
 There is no suggestion of any danger that the questionnaire would disrupt school activities or lead to a breach of the peace, which are the type of "substantive evils" that might justify a prior restraint, see Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919). Instead the majority, relying upon dicta in Tinker v. Des Moines School District, 393 U.S. 503, 508, 513, 89 S.Ct. 733, 737, 740, 21 L.Ed.2d 731 (1969), to the effect that school authorities may prohibit speech "that intrudes upon . . . the rights of other students," or "involves . . . an invasion of the rights of others" would include in these amorphous terms the dissemination to others of non-disruptive, non-defamatory and non-obscene material because it might cause some kind of "psychological" harm to an undefined number of students. With this I disagree. It represents an entirely too vague and nebulous extension of the concept of "rights" to support the drastic type of censorship and prior restraint sought by the defendants.
 
 
 33
 As we said in Eisner v. Stamford Board of Education, 440 F.2d 803, 808 (2d Cir. 1971), "The phrase 'invasion of the rights of others' is not a model of clarity or preciseness." The Tinker test makes sense as a standard designed to insure that school officials will be permitted, even at the expense of some freedom of expression, to maintain order on the school premises, particularly in the classroom, and it has been construed by ourselves and other circuits as permitting an abridgement of free speech toward that end. See Eisner v. Stamford Board of Education, supra; Katz v. McAulay, 438 F.2d 1058 (2d Cir. 1971), cert. denied, 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972); James v. Board of Education, 461 F.2d 566 (2d Cir.), cert. denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972); Quarterman v. Byrd, 453 F.2d 54 (4th Cir. 1971); Nitzberg v. Parks, 525 F.2d 378 (4th Cir. 1975); Burnside v. Byars, 363 F.2d 744 (5th Cir. 1968); Butts v. Dallas Independent School Dist., 436 F.2d 728 (5th Cir. 1971); Scoville v. Board of Education, 425 F.2d 10 (7th Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). Where physical disruption or violence is threatened, some inroads on free expression are tolerable because the interests of students and school officials are relatively specific and lend themselves to concrete evaluation. But a general undifferentiated fear of emotional disturbance on the part of some student readers strikes me as too nebulous and as posing too dangerous a potential for unjustifiable destruction of constitutionally protected free speech rights to support a prior restraint. A public school's premises are the very "marketplace of ideas" where personal intercommunication between students, in or out of the classroom, is "an important part of the educational process" even though some students may experience a degree of mental trauma in that process, Tinker v. Des Moines School Dist., 393 U.S. at 512, 89 S.Ct. at 740. If school officials are permitted to ban a questionnaire of the type here at issue because of possible "psychological" harm, they could prohibit the dissemination of a broad range of other articles on school premises on the same theory, even though the publications were readily available elsewhere and the information in them was instructive. Within the last few years, for instance, the New York Times, which represents that it publishes "All the News That's Fit to Print," has published numerous articles on the very matters that are the subject of plaintiffs' questionnaire, including items regarding the number of pregnant girls in public schools, the operation by New York City of a separate school for pregnant schoolgirls attended by up to 2,000 students annually, sexual activity among American teenagers, and the results of a nationwide study of adolescent sexuality.[1] Under the majority's decision, distribution of these items among students would be prohibited as posing a psychological danger to some. The possibilities for harmful censorship under the guise of "protecting" the rights of students against emotional strain are sufficiently numerous to be frightening.
 
 
 34
 Even accepting arguendo the majority's thesis to the effect that other students' rights include the right to be free of any emotional stress, defendants have failed to sustain their burden of showing that the First Amendment values in the present case are outweighed by the risk of psychological harm. The right of a newspaper to conduct a survey on a controversial topic and to publish the results represents the very quintessence of activity protected by the First Amendment. In a school environment, moreover, there is a positive value in the students' exercise of responsibilities associated with the publication of a newspaper, which gives them a greater appreciation for the true meaning and value of the Bill of Rights than they might otherwise possess.
 
 
 35
 The majority's holding that the values inherent in these basic rights are outweighed by the potential psychological harm which the questionnaire might cause to some students is based on conclusory and speculative opinions of a few psychologists, which are expressed in short affidavits, hypothetical rather than supported by any factual bases, untested by cross-examination, and flatly controverted by contrary affidavit opinions of other experts who possess equal if not superior qualifications as psychologists. All of the affidavits submitted by defendants, moreover, assume that a student possessed of fragile sensibilities would not only read the questionnaire but make an intensive effort to answer it, notwithstanding the statement on its face that "The survey is random and completely confidential. You are not required to answer any of the questions and if you feel particularly uncomfortable don't push yourself."[2] Some of the defendants' affidavits appear to be concerned principally with an issue not before the court the methodology used by the questionnaire and its invalidity from a scientific statistical viewpoint, rather than its psychological impact on students.
 
 
 36
 The conclusory and factually unsupported nature of the affidavit opinions relied on by the majority may be gathered from a brief summary of their contents. A 11/2 page affidavit of Ingram Cohen, Chief School Psychiatrist of the Bureau of Child Guidance of the defendant Board of Education, offers his view that "a" student "may become anxious or even depressed" when he is asked for a judgment about himself and has doubts concerning sexual orientation, and that the "administration" of the questionnaire to immature high school youths, "still in the throes of resolving personal identity," would be sufficiently "provocative" to be "potentially harmful and arouse concern." The two page affidavit of Vera S. Paster, Assistant Director of the same Bureau, states that dissemination of the questionnaire "constitutes a potentially harmful exposure to some students" because, in attempting to answer it they would experience an "up-churning of anxiety, conflict, self-doubt and other symptoms of stress" arising out of "conflicts about their own sexuality issues." Defendant's official in charge of evaluating research, Dr. Anthony J. Polemeni, who "was asked to apply professionally accepted research standards to (the) proposed research study," states that it does not meet such standards because it "presented significant possibility of violating the privacy of students and having harmful consequences to . . . students." In reviewing the questionnaire at issue, his standard was that "one does not undertake a non-critical survey which may, even remotely, create psychological trauma for even one person." In my view this is error. The standard should not be the effect of the questionnaire upon one or even a few exceptionally immature and impressionable students but its effect on the average. Cf., Roth v. United States, 354 U.S. 476, 489, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Butler v. Michigan, 352 U.S. 380, 383-84, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957).
 
 
 37
 Defendant also presented two affidavits from persons outside its own staff. One is Aaron H. Esman, Chief Psychiatrist at the Jewish Board of Guardians, which provides mental health services to emotionally disturbed children, a Director of Psychiatric Training at Madeleine Borg Child Guidance Institute, and Associate in Psychiatry at Columbia. He states that the survey may arouse "considerable anxiety and tension in a significant number of students" because of "bald" questions about sex. He concludes that while "it might be possible to devise a valid study of the sexual beliefs and attitudes . . . (It) is my view that this survey is poorly designed, unlikely to yield valid, verifiable or useful information and is potentially dangerous to the group for whom it was intended." Finally, Florence Halpern, a Clinical Professor at New York University School of Medicine and a former project director at HEW in charge of developing mental health guidelines for certain programs, states that "emotional and psychological harm is likely to occur and the chance of this happening is far greater than the possibility that no children will be injured." She continues: "Reading the questionnaire and thinking of answers to many of the queries would be very likely to stir up questions, doubts, fantasies and anxiety, resulting in impaired school performance because of sexual preoccupation, sleeplessness, heightened feelings of self-doubt, depression, and in some instances, even more disturbing reactions." For some students, she concludes, "the questionnaire might well be the force that pushes them into a panic state or even a psychosis."
 
 
 38
 The foregoing affidavits are flatly controverted by five eminently well-qualified experts who have worked extensively in the field of school psychology. Dr. Adam Munz, Chief Psychologist at St. Luke's Hospital, Assistant Professor of Clinical Psychiatry at Columbia University, Consultant to the Columbia University Health Services (where he actively works with students) and to the Cathedral School of St. John the Divine, swears in part:
 
 
 39
 "I have had the opportunity to peruse the material presented in connection with the 'Sexuality in Stuyvesant' questionnaire, including the questionnaire itself and the various affidavits submitted by all concerned with said questionnaire.
 
 
 40
 I would like to state, by way of a summary of my opinion in this matter, that in the more than 25 years of active experience as a clinical psychologist I have never encountered a situation in which a child, adolescent or adult has been adversely affected by a questionnaire! the statement that 'in some cases confrontation of this sort might lead to serious emotional difficulties' is totally unfounded and speculative.
 
 
 41
 The realities of life, the rawness of the world around us to which these youngsters are exposed daily on their way to and from school, are undoubtedly far more eroding of their development than a questionnaire could ever be." (Appendix, p. 148)
 
 
 42
 A detailed nine-page affidavit was furnished by plaintiff Gilbert M. Trachtman, professor of educational psychology, director of a school psychology program and of the NYU children's consultation service, president of the School Psychology Educators Council of New York State, past-president of the Nassau County Psychological Association and of the School Division of New York Psychological Association and a consultant to numerous public and private schools. He swore in part:
 
 
 43
 "3. I have objectively reviewed the questionnaire proposed for the article on 'Sexuality in Stuyvesant'. I emphasize that it is not only relevant and germane to the interests and concerns of the students in the 13-18 year age range, but can affirm from personal and professional experience that every question listed (in the questionnaire) touches upon topics frequently occurring in day to day conversations among students in this age group and no question could be unexpected, arcane or upsetting to students who associate in any manner with their peers, whose discussions will perforce include adversions to sexual issues.
 
 
 44
 4. The administration of Stuyvesant High School has, in the past, offered rap groups on sexuality to its students and encouraged participation in these open-ended, face to face verbal discussions. While these groups may have been led by trained teachers, they nevertheless exposed students to a degree of peer pressure and verbal confrontation far in excess of any impact created by a voluntary and anonymous written questionnaire. This statement in no way constitutes a criticism of peer rap groups, which are to be applauded, but is meant to place in proper perspective the mild impact of the projected questionnaire, which is considerably less invasive of personal privacy and much less likely to arouse anxiety.
 
 
 45
 5. For those youngsters who have already discussed sexual matters freely with peers, the questionnaire will have little or no impact. Those youngsters who have not participated freely in such discussion are quite likely to be reserved, shy or already anxious about sexual matters and therefore unwilling to share information and attitudes with peers. Such youngsters are likely to be less informed, to have less access to current relevant peer group norms and attitudes and to be anxious about themselves on the basis of misinformation, distortion or fantasy. For such youngsters the questionnaire may serve as an outlet for private communication, and a reassurance that others are concerned about similar matters, and the projected article based on this questionnaire may well serve a valuable educational purpose in reducing fantasy and distortion and relieving anxiety.
 
 
 46
 6. Youngsters of this age, living and travelling in an urban environment are constantly bombarded by sexually-laden stimuli. The media advertising, newspaper reports, TV drama, film, theatre are constantly dealing with homosexuality, unisexuality, bisexuality, premarital sex and all of the other topics covered in this questionnaire. Walking to and from school, youngsters meet prostitutes, are handed advertisements for massage parlors, and witness homosexual courtships. The defendants seem to assert that some of the questions in this questionnaire may arouse undue anxiety in some youngsters who are less well defended or whose personality adjustment is somewhat precarious. I would suggest that any youngster sufficiently fragile to suffer serious anxiety or depression upon reading questions which (s)he may ignore with impunity or respond to anonymously, is a youngster too fragile to have survived the trip from home to school. There is absolutely no evidence that the impact of this questionnaire will even remotely approximate the impact of all the sexually laden environmental stimuli already imposed upon these youngsters. . . .
 
 
 47
 9. The environment in the context in which the questionnaire at issue will be used, is an urban (New York City) high school in 1976. A school, as noted, situated in a city which bombards its inhabitants with sexual stimuli. Sexual stimuli, which include all topics covered in the proposed survey and extending quite beyond it. Indeed, recent research, 'Adolescent Sexuality in Contemporary America', Sorensen, R. C., 1973, N.Y.: World Publishing Co., indicates that sexual behavior is on the upswing among adolescents and that young people are increasingly explicit about sex.
 
 
 48
 The proposed survey is not only projected within this environmental context but, in turn, is an additional component within the environment. It is pertinent, therefore, to note the relevant characteristics of the questionnaire, and the manner of distribution of the proposed survey:
 
 
 49
 (1) It is voluntary; (2) it requires a written (and therefore private) communication, rather than a verbal (and public) communication; (3) it is anonymous; (4) a proposed cover letter outlines all of the above and further encourages the volunteer respondents to ignore any specific questions which make them uncomfortable." (Appendix, pp. 93-95, 96-97).
 
 
 50
 Harry B. Gilbert, Professor of Education at Fordham and Coordinator of the Urban School Psychology Program, was from 1955 to 1966 in charge of the examination for licensing of all school psychiatrists, psychologists, and guidance personnel for defendant, and prior to that served as supervisor of psychologists at defendant's Bureau of Child Guidance. He stated, among other things:
 
 
 51
 "I see the survey project and questionnaire here at issue as a classic example of adolescents reaching out for information and relief of concern in an area of great developmental moment to them. Adolescents are most interested in their newly developed sexual abilities and their inability to achieve expression of their interests and desires. Quite appropriately, there are legitimate reasons why sexual expression is difficult to achieve for young adolescents. But society makes the problem even more difficult by its failure to explore the extent of sexual knowledge, attitudes, practices and concerns among teenagers and to make provision for the sharing of such findings among teenagers in order to allow alleviation of anxiety that is prevalent. . . .
 
 
 52
 5. The danger that some students might be exposed to anxiety arousal exists. But it is so minute compared with the enormous benefit to be derived from students learning that their concerns are common and developmentally normal. Moreover, this would provide opportunity for genuine information to be shared and not leave sexual information to be gained solely from furtive peer whisperings or pornographic literature which does abound.
 
 
 53
 6. An effect of squelching this student proposal can only serve to drive sexual feelings further underground and to provide adolescents with a cause to do battle with authority figures who treat students as children, not budding adults." (Appendix, pp. 102, 103)
 
 
 54
 Professor Max Siegel (A104), President of the Division of Clinical Psychology of the American Psychological Association, past-president of the New York State Psychological Association and program head of the Graduate Program of School Psychology at Brooklyn College, states in part:
 
 
 55
 "Given that the questionnaire is voluntary and anonymous so that a student may choose not to participate without embarrassment (sic) or concern for peer pressure, there seems to be no basis for any expectation of emotional harm to individual students.
 
 
 56
 Indeed, I would conclude that the questionnaire and the resultant article may prove a valuable service and fill an important need for the students of Stuyvesant High School, providing them as it does with normative and demographic information which can play a valuable role in providing reality based contexts for discussion in areas of sexuality. Most adolescents discuss sexual issues frequently, and those who do not enter such discussions frequently are nevertheless quite likely to obsess and ruminate privately about these same issues, but with less facts and less information about their fellow students, and with consequent possibilities of more fantasy and more distortion, and, as a consequence, irrational anxiety. It is much more likely that collection and dissemination of relevant facts and attitudes from peers will prove to be constructive and useful than in any way harmful." (Appendix, pp. 105-106)
 
 
 57
 Victor B. Elkin (A107), Director of the National Institute of Mental Health Project Psychology in the schools, and for 20 years director of psychological services for the Long Beach City School District, swears:
 
 
 58
 "As a result of my 25 years of direct service to public school children, I have become sensitive and aware of the need to appropriately respect and effectively relate to the children in our schools. Not only do I not find this questionnaire objectionable or dangerous, but actually I find it to have positive mental health implications. In today's day and age, with sexuality ramptantly (sic) used in advertising, entertainment, in literature, the questions presented in this questionnaire are actually benign.
 
 
 59
 4. For many young boys or girls of high school age, such a questionnaire could serve as a positive impetus for facing and coming to grips with many issues regarding their own personal thoughts and feelings about themselves, within a sexual context. Very much like the cliche, that it is healthier for the child to learn about sexuality from a parent rather than 'in the street,' it is although healthier for a child to learn about or become in touch with his or her own thoughts and feelings, and even anxieties from a questionnaire which might stimulate thinking, rather than from headlines and various magazines, newspapers, or the screaming announcements of theater marquees." (Appendix, pp. 108, 109)
 
 
 60
 If the issue before us were to be decided on the credentials and independence of the experts offered by both sides, plaintiffs would probably have the edge. Without denigrating the standing of defendants' experts, the credentials and experience of plaintiffs' experts are more impressive. Moreover, four of the five experts offered by the plaintiffs (Munz, Gilbert, Siegel and Berger) are independent, whereas a majority of the defendants' psychologists (Cohen, Paster, and Polemeni) are employed by the defendants. More important, however, is the failure of the defendants, who have the burden, to provide any factual foundation for the conclusions voiced by them and their experts. In this day and age, when children in New York City are literally bombarded with explicit sex materials on public newsstands on the way to and from school, when they are encouraged openly and frankly to discuss sex topics and problems in "rap sessions" sponsored by their schools (which, unlike the questionnaire at issue are face-to-face and not anonymous), when the children actually do discuss sex with their peers at school, when the number of teenage pregnancies in New York City's public high schools such as Stuyvesant is so high that the City has operated a special high school for pregnant high school girls attended by up to 2,000 pregnant teenagers annually, when adolescent sexuality is openly discussed in New York newspapers, I believe the defendants have failed completely to demonstrate any reasonable likelihood that the questionnaire poses any substantial harm to any appreciable number of high school students.
 
 
 61
 The picture drawn by the defendants of high school freshmen and sophomores (to say nothing of juniors and seniors) as fragile, budding egos flushed with the delicate rose of sexual naivety, is so unreal and out of touch with contemporary facts of life as to lead one to wonder whether there has been a communications breakdown between them and the next generation. Yet the defendants' sponsorship of "rap sessions" among students to discuss these very matters indicates not only an awareness of the high school student's knowledge and insight into sex matters but a strange inconsistency with the defendants' attitude toward the questionnaire. If face-to-face, non-anonymous discussions between students of the very matters that are the subject of the questionnaire causes no psychological harm to those involved, I cannot believe that an anonymous questionnaire, which states right on its face that the recipient need not answer it but is free to throw it away, would do so, I can only conclude that the defendants are more concerned about the structure and methodology of the questionnaire than about its alleged psychological impact.
 
 
 62
 Other courts, when faced with substantially the same problem, have not hesitated to find that distribution of sexual material in school to students is protected by the First Amendment and that school authorities failed to sustain their heavy burden of demonstrating that prohibition of such distribution was reasonably necessary to guard against harm to the students' rights. See, e. g., Shanley v. Northeast Independent School Dist., 462 F.2d 960 (5th Cir. 1972) (school newspaper article discussing birth control). Indeed, in Bayer v. Kinzler, 383 F.Supp. 1164 (E.D.N.Y.), aff'd, 515 F.2d 504 (2d Cir. 1974), we affirmed a district court decision finding that the distribution of a sex information supplement to a school newspaper was constitutionally protected. I fail to find any significant legal distinction between these holdings and the present case.
 
 
 63
 I do agree with the majority that Judge Motley's Solomonic judgment, which would cut the baby in half by permitting distribution of the questionnaire to juniors and seniors while denying it to freshmen and sophomores, cannot stand, in view of the failure of the record to reveal any substantial evidentiary basis for the distinction other than the surmise that the younger students would be more vulnerable to possible psychological trauma than the older ones. However, for the reasons stated, the defendants have failed to sustain their burden as to either group.
 
 
 64
 Accordingly I would affirm the district court's holding that the questionnaire may be distributed to juniors and seniors, reverse its holding that the questionnaire may not be distributed to freshmen and sophomores and direct the court to retain jurisdiction for the purpose of resolving any dispute that might arise with respect to distribution of any resulting school newspaper article that might be written.
 
 
 
 [1]
 We note that the senior class at Stuyvesant was scheduled to graduate on June 22, 1977 and, thus, Jeff Trachtman may no longer be a member of the student body. However, assuming Trachtman has graduated, we do not think that the case has thereby become moot. See, e.g., DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). In bringing this suit Trachtman was acting not only as a student but in a representational capacity as editor-in-chief of "The Stuyvesant Voice." Thus, plaintiffs' complaint states that Trachtman is the editor-in-chief of the "Voice" and that the proposed survey was prepared by members of the "Voice" staff in preparation for an article to appear in a March 1976 issue of the "Voice." The record indicates that the questionnaire at issue and the proposed article were approved by the entire editorial board of the "Voice." The complaint requests relief on behalf of "plaintiffs and other (sic) similarly situated" and asks that the defendants be enjoined from prohibiting the publication and interpretation of the results of the questionnaire in the "Voice." Further, Judge Motley specifically noted that in seeking permission to conduct the survey Trachtman was acting "in his capacity as editor-in-chief of . . . the Voice."
 Although the complaint did not formally so assert, Trachtman was litigating in a representational capacity. Cf. Richardson v. Ramirez, 418 U.S. 24, 36-40, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974). Plaintiffs seek to vindicate not only Trachtman's rights as an individual student, but the right of the "Voice" and its staff to conduct the survey. Accordingly, we think the fact that Trachtman may no longer be a student at Stuyvesant does not moot the case as we have no doubt that there is a proper adversary relationship here to assure proper presentation of the issues (plaintiffs are represented by an attorney affiliated with the New York Civil Liberties Union), see Franks v. Bowman Transportation Co., 424 U.S. 747, 752-57, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), and plaintiffs may be considered as acting on behalf of a student association and its members who have a continuing stake in this litigation. Cf. Hunt v. Washington State Apple Advertising Commission, --- U.S. ----, ----, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).
 
 
 [2]
 Plaintiffs' desire to use Stuyvesant students as research subjects distinguishes this case from such cases as Shanley v. Northeast Independent School District, 462 F.2d 960 (5th Cir. 1972) and Bayer v. Kinzler, 383 F.Supp. 1164 (E.D.N.Y.1974), aff'd, 515 F.2d 504 (2d Cir. 1975), which held that school officials could not restrain the distribution of school newspapers containing information about birth control. The questionnaire does not seek to convey information but to obtain it in a manner that school officials contend may result in psychological damage. The fact that some students may read the proposed cover letter and decide not to answer the questionnaire does not diminish the legitimate concern of school officials for those students who decide to answer it
 Further, we cannot ignore the fact that plaintiffs intend to present a report on "Sexuality in Stuyvesant," which will attempt to interpret the results of the questionnaire and make conclusions based thereon. We think the school officials may legitimately be concerned that the proposed article will attempt to make "scientific" conclusions about the sexual habits of Stuyvesant students that may be misleading.
 
 
 [3]
 Plaintiffs do not challenge the procedure by which the Board's decision was reached and this case does not involve any administrative regulation placing a per se ban on all student surveys. Compare Eisner v. Stamford Board of Education, 440 F.2d 803 (2d Cir. 1971). It is clear that defendants have not tried to suppress all forms of student expression on sex-related matters. Indeed, the curriculum at Stuyvesant includes both formal courses on sex education and peer-group discussion sessions. See discussion, infra. Further, the record shows that defendants would not have attempted to prevent distribution of the questionnaire off school grounds. In addition, this entire controversy has been reported in an article in the school newspaper, which included one of the questions in the questionnaire. See Record, affidavit of Sanford Gelernter, exhibit K. Thus, this case involves restriction of only one among many methods of communication between students on sex-related matters, which the Supreme Court has noted, "is not without significance to First Amendment analysis, since laws regulating the time, place or manner of speech stand on a different footing than laws prohibiting speech altogether." Linmark Associates, Inc. v. Township of Willingboro, 431 U.S. 85, 93, 97 S.Ct. 1614, 1618, 52 L.Ed.2d 155 (1977)
 
 
 [4]
 Similarly, in Katz v. McAulay, 438 F.2d 1058 (2d Cir. 1971), cert. denied, 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972), we upheld the denial of a preliminary injunction against high school officials' refusal to allow the distribution of leaflets soliciting funds for a political cause on public school grounds noting that, "The Board's regulation appears to be reasonable and proper and has a rational relationship to the orderly operation of the school system." Id. at 1061. See Tinker v. Des Moines Independent Community School District, supra, 393 U.S. at 513, 89 S.Ct. 733. Nitzberg v. Parks, 525 F.2d 378, 382-83 (4th Cir. 1975); Butts v. Dallas Independent School District, 436 F.2d 728, 732 (5th Cir. 1971); Scoville v. Board of Education, Joilet Township, 425 F.2d 10, 13-15 (7th Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). See also, Presidents Council, District 25 v. Community School Board No. 25, 457 F.2d 289 (2d Cir.), cert. denied, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972)
 
 
 [5]
 Although Tinker provides that "undifferentiated fear or apprehension" of a disturbance is not sufficient cause to justify interference with students' freedom of speech, 393 U.S. at 508, 89 S.Ct. 733, school authorities need only demonstrate that the basis of their belief in a potential disruption is reasonable and not based upon speculation. See Eisner v. Stamford Board of Education, supra, 440 F.2d at 810; note 3, supra
 
 
 [6]
 For example, the Board of Education has promulgated "Guidelines for Implementation of Family Living/Sex Education Programs." The guidelines provide that teachers desiring to teach such courses must have special training and "all teachers must possess sensitivities about adolescents and sex, their parents, the value system of families, and have a sense of propriety in their classroom behavior."
 
 
 [7]
 Thus, the Board guidelines, see note 6, supra, which were promulgated in May, 1974, provide, "Teachers, college students, agencies shall neither administer nor participate in surveys eliciting responses about personal sexual behavior from students. Such sex-behavior inventories, as all other health-related surveys, must receive approval from the Board of Education through its Coordinating Council on School Health."
 The Board has also promulgated a handbook for research applicants, which provides for certain requirements and safeguards before research involving student subjects may be conducted. The district court rejected the argument that the survey could not go forward because it did not comply with the handbook, which the court found did not apply to student projects, and this issue has not been raised on appeal. However, defendants point out that the handbook and other administrative regulations demonstrate the Board's concern in protecting the well being of students.
 
 
 [8]
 See affidavits of Gilbert Trachtman and Harry B. Gilbert. See also affidavit of Max Siegel
 
 
 [9]
 We find no merit in plaintiffs' argument that defendants' concern is for only a minority of students and amounts to a "heckler's veto." See Eisner v. Stamford Board of Education, supra, 440 F.2d at 809 n.6. The issue here is not to what extent school authorities are obligated to protect the dissemination of unpopular views. There is a clear distinction between the speaker's right not to be shouted down and the listener's right to be protected against the importunities of those who seek answers to questions
 Further, we cannot ignore that the district court not only restrained defendants from prohibiting the survey but ordered them to take steps to oversee the distribution of the questionnaire and provide counseling for those students who were disturbed by it; in effect, defendants were told to expend time and money to provide "safeguards" for a survey they insisted could not be made safe. The student's right to speech and expression simply does not extend so far.
 
 
 [1]
 A few recent New York Times articles or editorials pertaining to the subject are summarized in its index:
 E. g., New York Times, March 21, 1976, at p. 29, col. 1; id., Oct. 16, 1976, at p. 27, col. 2; id., June 28, 1974, at p. 17, col. 4.
 
 
 [2]
 I would have no objection to our conditioning distribution of the questionnaire upon the same or similar language being printed in bold type and given an even more prominent position either on the face of the letter covering the questionnaire or on the questionnaire itself