Jeanne BRANDON, a minor, by her parents Mr. D. Brandon and Mrs. Anne Brandon; Erin Marie Conway; Jill George, a minor by her parents Mr. John George and Mrs. Joan George; Lisa A. Macaione: Lauren M. Rogers and William Smith, a minor by his legal guardians Mr. Charles LaPlante and Mrs. Sally LaPlante, Individually and on behalf of those similarly situated, Plaintiffs,

v.

The BOARD OF EDUCATION OF the GUILDERLAND CENTRAL SCHOOL DISTRICT; Peter E. Knauss; Grace Serviss; William P. Chamberlin; Joseph L. Cohen; Beverly LeBlanc; Gordon S. Purrington; Patricia Renshaw; Alan L. Ross; Richard M. Smith; Peter W. Alland and Charles Ciaccio, Defendants.

No. 79–CV–399.

United States District Court,
N. D. New York.

April 16, 1980.

Robert M. Andersen, Catholic League for Religious & Civil Rights, Milwaukee, Wis., Robert Roche, Albany, N. Y., Attorney of Record, for plaintiffs.

C. Theodore Carlson, Tabner, Carlson, Daffner & Farrell, Albany, N. Y., for defendants.

Leo Pfeffer, American Jewish Congress, New York City, for amicus curiae.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

Plaintiffs, a group of students at Guilderland High School, have commenced this action for declaratory and injunctive relief and for damages, as a result of the defendants' refusal to allow them, as members of a group called "Students for Voluntary Prayer", to use a room in the school to conduct a communal prayer meeting immediately prior to the beginning of school each day.[1] The action has been brought pursuant to 42 U.S.C. § 1983 with jurisdiction properly alleged under 28 U.S.C. § 1343(3).

The defendants named in this lawsuit are the Board of Education of the Guilderland Central School District, the individual members of the Board, Peter W. Alland, Superintendent of the School District, and Charles Ciaccio, Principal at Guilderland High School. This case is presently before the Court on plaintiffs' motion for summary judgment pursuant to Rule 56 of the Fed.R. Civ.P. on their request for declaratory and injunctive relief.[2] Defendants seek denial of the motion, and while making no formal cross-motion for summary judgment, request that the Court search the record and dismiss the complaint on the ground that plaintiffs are not entitled to the relief sought as a matter of law.

## BACKGROUND

Plaintiffs are the organizers of a group called "Students for Voluntary Prayer". In September of 1978, plaintiffs Lauren Rogers and William Smith, acting on behalf of the other plaintiffs and "Students for Voluntary Prayer" sought permission from defendant Charles Ciaccio to use a room in the Guilderland High School for the purpose of conducting a communal prayer meeting each day before classes.[3] According to plaintiffs, the request was made entirely on their own initiative. The proposed meetings were to be held without any official school assistance, supervision, aid or participation and with volunteer adult supervision. Plaintiffs contend that attendance at the meetings would be voluntary and that the sessions would be completely separate, distinct and independent from all other school functions.

Defendant Ciaccio denied the request by letter dated September 23, 1978. Defendant Alland, Superintendent of the School District, responding to the same request, informed plaintiff Smith, by letter dated

---

1. The plaintiffs who were minors at the time this action was commenced are represented by their parents or legal guardians. Plaintiffs Erin Marie Conway, Lisa A. Macaione and Lauren Rogers have now graduated, and the defendants argue that the action should be dismissed as to them as moot.

2. Rule 56(c) of the Fed.R.Civ.P. provides in part that summary judgment shall be rendered:

 . . . if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

 Plaintiffs are not presently seeking summary judgment on their claim for damages in the sum of $10,000 for each named plaintiff.

3. Defendants question whether the plaintiffs' request for use of a school room was limited to just before the commencement of the school day and suggest that an issue of fact is raised thereby. Plaintiffs, in their complaint, however, seek use only immediately prior to commencement of the school day and counsel for plaintiffs indicated a willingness to stipulate that such use is sought.

November 15, 1978, that the school attorney had advised him that it would be impermissible for the school to grant the request. The Board of Education, at a meeting held on December 19, 1978, voted to deny permission as well.

Plaintiffs Conway, Rogers and Smith renewed the request at meetings of the defendant Board of Education held on February 27, 1979 and March 6, 1979. At the March 6th meeting, the Board collectively approved a resolution reaffirming its December 18, 1978 action denying plaintiffs the use of a school room for prayer meetings.[4] The present action was commenced as a result of defendants' refusal to grant plaintiffs' request.

## DISCUSSION

In seeking summary judgment, plaintiffs ask the Court for a declaration that defendants' refusal to allow student prayer groups to meet voluntarily on public school property before the commencement of classes, constitutes a violation of the students' constitutional rights under the First and Fourteenth Amendments, to free exercise of religion, freedom of speech, freedom of association and equal protection under the law. In addition, plaintiffs seek the issuance of an injunction, enjoining the defendants from continuing to abridge the constitutional rights of plaintiffs and those similarly situated by denying them the use of a school room for prayer meetings.

Opposing plaintiffs' motion, defendants first argue that the complaint in this action must be dismissed as a result of plaintiffs' failure to present a written verified complaint to school officials within three months after the accrual of their claim as required by New York State Education Law § 3813(1). Defendants further claim that the action must be dismissed as to plaintiffs Conway, Macaione and Rogers on mootness grounds; that the action should not proceed without naming the New York State Commissioner of Education as a party defendant in order to avoid risk to the named defendants of incurring double or otherwise inconsistent obligations in light of the authority of the Commissioner; and that plaintiffs have failed to satisfy the requirements for a class action under Rule 23 of the Fed.R.Civ.P.[5] Finally, defendants contend that allowing plaintiffs the use of a school room for prayer meetings would be in violation of the Establishment Clause of the First Amendment to the Constitution as well as in violation of the laws and policies of the State of New York and Commissioner of Education.

## I.

Since a finding by this Court that failure by the plaintiffs to satisfy the requirements of Education Law § 3813(1) would require dismissal of the action and render determination of the other issues raised in this lawsuit unnecessary, discussion of the applicability of that section in the present case is warranted at this point.

Section 3813(1) provides in pertinent part that:

No action or special proceedings, for any cause whatever, except as hereafter provided, relating to district property or property of schools provided for in article

---

4. Plaintiffs assert that the denial was in violation of a resolution approved by the Board on June 14, 1976, entitled "Students' Rights and Responsibilities at Guilderland High School" which provided in part that students could "meet at authorized times and places on a voluntary basis, with like-minded fellow students, for spiritual or religious conversation or activities, and without participation or involvement of school staff." The resolution, however, is not legally binding, and would not serve even to give the defendant Board the authority to grant plaintiffs' request if the result would be a violation of the Establishment Clause.

5. As plaintiffs point out, however, they are not seeking to act as representatives of a class under Rule 23 of the Fed.R.Civ.P. in this action. Rather, plaintiffs seek constitutional third-party standing, *jus tertii*, in order to protect the rights of individuals who may be affected by the outcome of this case but who are not parties and who for various reasons cannot easily become parties. See e. g. *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

eighty-five of this chapter or chapter ten hundred sixty of the laws of nineteen hundred seventy-four or claim against the district or any such school, or involving the rights or interests of any district or any such school shall be prosecuted . . .. Unless it shall appear by and as an allegation in the complaint or necessary moving papers that a written verified claim upon which such action or special proceeding is founded was presented to the governing body of said district or school within three months after the accrual of such claim and that the officer or body having the power to adjust or pay said claim has neglected or refused to make an adjustment or payment thereof for thirty days after such presentment.

Plaintiffs admittedly did not satisfy the notice requirement contained in the section prior to commencing this action. Defendants contend that the statutory provision establishes a condition precedent to the commencement of the lawsuit and assert that plaintiffs' failure necessitates dismissal of the complaint.

■ Plaintiffs, on the other hand, argue that compliance with the notice requirement is not mandatory in civil rights actions brought pursuant to 42 U.S.C. § 1983. While defendants are correct in their assertion that Section 3813(1) generally serves as a condition precedent to the commencement of non-tort claims against the school district, the law is fairly well settled, at least with regard to notice requirements in claims against municipalities, that such requirements are inapplicable to § 1983 actions. See *Glover v. City of New York*, 401 F.Supp. 632, 635 (E.D.N.Y.1975); *Carrasco v. Klein*, 381 F.Supp. 782, 787, n.12 (E.D.N.Y.1974); *Laverne v. Corning*, 316 F.Supp. 629, 637 (S.D.N.Y.1970).

■ Although the cases relied upon by the Court involved the application of the New York State General Municipal Law § 50–e notice of claim procedure,[6] this Court can find no reason why the same rule

would not be applicable with regard to the requirements under Education Law § 3813(1). This is especially true since the rationale behind the exemption is at least in part, that to require the notice as a condition precedent to the commencement of this action, would result in an unlawful limitation by state law on rights granted under a federal statute. See *Laverne v. Corning, supra*, at 637. The result would be the same in cases falling under § 3813(1). Therefore, the Court finds that plaintiffs are not precluded from pursuing this action under 42 U.S.C. § 1983 as a result of their failure to satisfy § 3813(1).

## II.

■ Although defendants in their second amended answer to the complaint, assert a claim of mootness with regard to the three plaintiffs who have now graduated from Guilderland High School, they have failed to address the issue in opposition to plaintiffs' motion for summary judgment. Nonetheless, the Court must decide the mootness question since proper exercise of its jurisdiction is dependent upon satisfaction of the constitutional requirement of a live "case or controversy". *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

■ Upon reviewing the situation presented in this lawsuit, the Court, for several reasons, is convinced that dismissal of the action on mootness grounds is both unnecessary and inappropriate. In that regard, it should be pointed out at the outset that there are plaintiffs to this action who are presently students at Guilderland High School, albeit only for a few more months. These remaining students clearly have a legally cognizable interest in the outcome of the action.

Aside from that, the pleadings indicate that this action was commenced by the

---

**6.** General Municipal Law § 50–e, while not in itself creating an obligation to serve notice, prescribes the manner in which notice is to be given when required by statute in an action against a municipality.

plaintiffs, not only on their own behalf but as representatives of the organization "Students for Voluntary Prayer" and on behalf of all students similarly situated. See *Trachtman v. Anker*, 563 F.2d 512, 514 n.1 (2d Cir. 1977), *cert. denied* 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978).[7] Since the Court has received no information to the contrary, the situation complained of has apparently not been resolved to plaintiffs' satisfaction, and the Court must, therefore, assume that a proper adversarial relationship assuring presentation of the issues still exists.[8]

■ In addition, the Court notes that plaintiffs' claim for relief is not limited to declaratory and injunctive relief but also includes a sizable demand for damages which remains extant as to the graduated plaintiffs. So long as the damages claim is based upon the denial of a personal liberty rather than a property right [*Eisen v. Eastman*, 421 F.2d 560 (2d Cir. 1969) (1970) *cert. denied* 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970)], and is not "so insubstantial or so clearly foreclosed by prior decisions that [the] case may not proceed," (*Memphis Light, Gas & Water v. Craft, supra*, 436 U.S. at 9, 98 S.Ct. at 1560), the action need not be dismissed as moot. See also *Powell v. McCormack, supra; McCabe v. Nassau County Medical Center*, 453 F.2d 698 (2d Cir. 1971).

Finally, while the Court need not decide on this basis, it should be mentioned that the present case arguably falls within the mootness exception for those "capable of repetition, yet evading review". *So. Pac. Terminal Co. v. Int. Comm. Comm.*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

### III.

Having disposed of the jurisdictional and procedural issues raised by the defendants, the Court must now address itself to the onerous task of determining whether plaintiffs are entitled to the relief sought.[9]

As aptly stated by Justice White in the recent Supreme Court decision in *Committee for Public Education v. Regan*, ⎯ U.S. ⎯⎯, ⎯⎯ ⎯ ⎯⎯, 100 S.Ct. 840, 851, 63 L.Ed.2d 94 (1980):

> Establishment Clause cases are not easy; they stir deep feelings; and we are divided among ourselves, perhaps reflecting the different views on this subject of the people of this country. What is certain is that our decisions have tended to avoid categorical imperatives and absolutist approaches at either end of the range of possible outcomes.

Defendants in this action assert that their refusal to allow plaintiffs use of a school room for prayer meetings is mandated by the Establishment Clause of the First Amendment, and that contention will be the starting point for this Court's analysis of the question before it.

■ The First Amendment to the United States Constitution provides in pertinent part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The Establishment Clause and the Free Exercise Clause have been made applicable to the States through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 903, 84 L.Ed.

7. *Trachtman* was an action brought by a high school student who sued on a First Amendment claim, not only on his own behalf but as representative of the school newspaper of which he was the editor. The Court found that although plaintiff had graduated the case was not moot since he had brought the action on a representative as well as individual basis.

 The similarities in the present case in the opinion of the Court, justify some reliance on *Trachtman* in resolving the mootness issue.

8. Distinguish *DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) in

which the Supreme Court found a law school admissions discrimination case moot because the plaintiff was about to graduate from law school. Unlike the present case, DeFunis brought the action on his own behalf and did not seek to present any group.

9. This case presents a particularly troublesome situation for the Court, since it must decide whether plaintiffs are to be allowed to gather for religious purposes, an endeavor which under most circumstances would be heartily encouraged among young people in society.

1213 (1940). The acts of the defendants herein, since they are charged with the supervision of public schools pursuant to statutory authority constitute state action within the scope of those Amendments. *Abington School Dist. v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

The Supreme Court has had numerous opportunities to consider the Establishment Clause, both by itself and in conjunction with the Free Exercise Clause, and in *Zorach v. Clauson*, 343 U.S. 306, 312, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952), Justice Douglas concluded that:

> There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated. And so far as interference with the 'free exercise' of religion and an 'establishment' of religion are concerned, the separation must be complete and unequivocal. The First Amendment within the scope of its coverage permits no exception; the prohibition is absolute. The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter.

Instead of demanding an absolute separation of Church and State, the Supreme Court has consistently required only that a state assume a position of neutrality, as articulated in *Abington School Dist. v. Schempp, supra*, 374 U.S. at 226, 83 S.Ct. at 1574, by Justice Clark who wrote that:

> The place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to recognize through bitter experience that it is not within the power of government to invade that citadel, whether its pur-

pose or effect be to aid or oppose, to advance or retard. In the relationship between man and religion, the State is firmly committed to a position of neutrality.

In maintaining the requisite neutrality, the State is not required or even encouraged to assume a posture of hostility to religion but rather one of neutral accommodation. *Zorach v. Clauson, supra*. However, the Supreme Court has made it clear that in maintaining a policy of neutral accommodation, care must be taken to insure that the limits are not overstepped, resulting in an impermissible aid to religion.[10] Such care is necessary because as pointed out by the Supreme Court in *Abington School Dist. v. Schempp, supra*, 374 U.S. at 225, 83 S.Ct. at 1573, "[t]he breach of neutrality that is today a trickling stream may all too soon become a raging torrent . . ."

When called upon to determine the constitutionality of conduct challenged under the Establishment Clause, the Court

> must draw lines with reference to the three main evils against which the Establishment Clause was intended to afford protection: 'sponsorship, financial support, and active involvement of the sovereign in religious activity.' *Walz v. Tax Commission*, 397 U.S. 664, 668 [90 S.Ct. 1409, 1411, 25 L.Ed.2d 697] (1970)

*Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

In *Lemon v. Kurtzman, supra*, 403 U.S. at 612–13, 91 S.Ct. at 2111, the Court announced a tripartite test, gleaned from the First Amendment cases previously decided by the Court, for application in determining whether particular state action violates the Establishment Clause. The test, most recently applied by the Supreme Court in *Committee for Public Education v. Regan, supra*, provides that state action does not contravene the Establishment Clause if "it has a secular legislative purpose, if its

---

**10.** See e. g. *Roemer v. Maryland Public Works Bd.*, 426 U.S. 736, 747, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179 (1976), in which the Supreme Court cautioned that:

The Court has taken the view that a secular purpose and a facial neutrality may not be enough, if in fact the State is lending direct support to a religious activity.

principal or primary effect neither advances nor inhibits religion, and if it does not foster an excessive government entanglement with religion." —— U.S. at ——, 100 S.Ct. at 846.

■ If state action is to pass constitutional muster, all three of the factors must be satisfied. See *Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973).

■ In applying the three factors to the present case, it is apparent that the question of whether the state action involved in this case has a secular purpose, has little if any applicability, since no affirmative action on the part of the defendants is challenged as in violation of the Establishment Clause. However, looking at the situation in the abstract, it is clear to the Court that the exercise by defendants of their authority, in accordance with State law and district regulations, in making decisions as to the use of school premises by student organizations is secular in nature.[11] Thus insofar as the first factor might be considered applicable in this case, it has been satisfied.

■ The second and third factors, whether the principal and primary effect of the state action: (1) either advances or

inhibits religion, or (2) results in excessive entanglement between Church and State, present far more serious problems for the Court. The problems stem not only from the fact that there is no simple or clear cut answer but because a review of the Supreme Court's analysis of these factors in cases previously decided by it, compels this Court reluctantly to conclude that plaintiffs' proposal here, i. e., to allow students to meet regularly on school premises, immediately prior to the commencement of the school day,[12] for religious purposes, runs afoul of both factors.

Plaintiffs do not deny their intent to use public school property for religious purposes, but contend that making a room available to them for prayer meetings would be lawful accommodation of religion by the defendants. Defendants disagree, claiming that such an allowance would surpass the bounds of permissible accommodation and result in an impermissible advancement of religion.

The Supreme Court in discussing the "primary effect" factor of the tripartite test explained that:

> The crucial question is not whether some benefit accrues to a religious institution

11. The same conclusion was reached in *Johnson v. Huntington Beach U. High Sch. Dist.*, 68 Cal.3d 1, 137 Cal.Rptr. 43 (1977), a case in which the Court supported the school's denial of permission to students to hold Bible study club meetings on school premises during school hours.

In *Chess v. Widmar*, 480 F.Supp. 907 (W.D. Mo., 1979), college students were denied permission to hold religious meetings on college property with the Court finding that the secular purpose requirement was not a bar to plaintiffs' request since "[a] university policy that permitted *any* student group to meet in university-owned buildings for *any* purpose would aid all student groups regardless of religious affiliation and would, therefore, reflect a clear secular purpose." p. 914.

12. Plaintiffs place a great deal of weight on the fact that they seek to meet prior to rather than during the school day. Defendants, on the other hand, argue that the time immediately prior to the commencement of classes is a part of the school day and assert that this opposing view demonstrates the existence of a material issue of fact precluding summary judgment.

The Court, however, disagrees, finding that it is not necessary to make a factual determination as to whether or not the time period involved is technically a part of the official school day. It is clear and the parties do not dispute, that at the time plaintiffs wish to meet, the school will have been officially opened for the day for educational purposes, and the public school busses will have begun delivering students for the commencement of the school day.

Thus any attempt by plaintiffs to argue that at the time they seek to meet, the school is simply another public building, must fail.

See L. Tribe, *American Constitutional Law*, (1978), p. 825 n.12, relied upon by plaintiffs for the proposition that:

[a] distinction might be drawn where the school buildings *are not otherwise in use*, as at night or during a vacation period, when the building is in a sense, surplus land. (emphasis added)

Clearly this is not the type of situation envisioned by Mr. Tribe.

as a consequence of the legislative program, but whether its principal or primary effect advances religion.

*Tilton v. Richardson,* 403 U.S. 672, 679, 91 S.Ct. 2091, 2096, 29 L.Ed.2d 790 (1971).

It could hardly be claimed in this case that no benefit would accrue to religion should plaintiffs be allowed to use school property for prayer meetings. The question then, as posed by the parties, is whether the benefit to religion can be classified as a mere accommodation and thus permissible, or whether as defendants claim, the result would be an impermissible advancement of religion.

Although the Supreme Court has not decided a case directly on point with this one, that Court has, on numerous occasions, had before it cases involving challenges either to religious instruction or the recitation of prayers in the public school setting.

In *McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), the Court found that the Establishment Clause was violated by a program in which school officials allowed religious groups to hold religious instruction classes in the classrooms of the public school during school hours for students whose parents had given permission for their child's attendance. Those students not attending were sent to a different place in the school during the instruction. The school system incurred no expense for the instruction, and the instructors were subject to the approval of school officials.

In reaching its decision, the Court pointed out that:

> To hold that a state cannot consistently with the First and Fourteenth Amendments utilize its public school system to aid any or all religious faiths or sects in the dissemination of their doctrines and ideals does not, as counsel urge, manifest a governmental hostility to religion or religious teachings. 333 U.S. at 211–12, 68 S.Ct. at 465.

The Court in *McCollum* expressed serious concern not only that the State's tax-supported public school buildings were being used for the dissemination of religious doctrine but also that the program helped "to provide pupils for their religious classes through use of the State's compulsory public school machinery," (333 U.S. at 212, 68 S.Ct. at 466) and gave the appearance of a stamp of approval on religion by the State.

The Court addressed the religious instruction issue once again in *Zorach v. Clauson, supra.* However, in that case, the instruction was not held in the classroom but rather off of school premises in a "release time" program in which students were released during the school day at the request of their parents in order to attend religious instruction programs. In distinguishing the case from *McCollum,* the Court stressed that the instruction was not held in the public school classroom thus not resulting in the appearance of school authority throwing its weight of authority behind religion. Furthermore, the program did not involve the expenditure of public funds and was completely voluntary with school officials assuming a neutral position by merely releasing the students upon parental request. Justice Douglas, justifying the Court's decision that the program did not violate the First Amendment wrote that:

> We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. . . . When the State encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. 343 U.S. at 313–14, 72 S.Ct. at 684.

Should the plaintiffs prevail in this action, it is difficult to perceive any other result than the use of public school property for religious purposes.[13] Not only would

---

13. The Court is not unmindful of plaintiffs' argument that use of the term "classroom" by the Supreme Court was intended to be in the instructional sense rather than geographic. Although the Court would agree that the rationale in *McCollom* was at least to some degree

this constitute a contribution by the State of financial assistance to religion (provision of free rent and utilities for prayer meetings), but it would logically lead to the outward appearance of the placement of official state sanction on religious activity.[14]

Such conduct has been proscribed by the Supreme Court on numerous occasions. See e. g. *Abington School District v. Schempp,* supra, 374 U.S. at 216–19, 83 S.Ct. at 1568–69, in which state sanctioned Bible reading in public school classrooms was disallowed; and *Engel v. Vitale,* 370 U.S. 421, 430–36, 82 S.Ct. 1261, 1266–69, 8 L.Ed.2d 601 (1962), in which the Court found that state imposed recitation of a non-denominational official state prayer was a violation of the Establishment Clause.

 State involvement in the present case would obviously not reach the proportion of that in either *Abington School District v. Schempp, supra* or *Engel v. Vitale, supra.* Nonetheless, while it is a fairly close question, the Court must conclude that the involvement which would result from allowing plaintiffs use of public school property for prayer meetings, even if confined to pre-instruction school hours, would have the fatal primary effect of advancing religion both by the use of tax-supported property for religious purposes and the appearance

created of State support for the dissemination of religious doctrine.[15]

Inasmuch as the Court has concluded that the activity proposed by plaintiffs would fail the second part of the tripartite test, it is not necessary to consider the excessive entanglement issue in any great detail. However, some discussion is appropriate.

The question of excessive entanglement has been most thoroughly addressed by the Supreme Court in cases involving state aid to private schools. See e. g. *Meek v. Pittenger,* 421 U.S. 349 at 372, 95 S.Ct. 1753 at 1766, 44 L.Ed.2d 217; *Committee for Public Education v. Nyquist, supra* ; and *Lemon v. Kurtzman,* 403 U.S. at 615, 91 S.Ct. at 2112. As pointed out by the Court in *Lemon v. Kurtzman, supra,* 403 U.S. at 625, 91 S.Ct. at 2117:

> The Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice, and that while some involvement and entanglement are inevitable, lines must be drawn.

In the state aid cases, excessive entanglement has been found when the legislation providing the assistance required constant surveillance by the state to insure that no funds were used for religious purposes.

based upon the idea of the classroom in the instructional sense (i. e., concern over the significance which would be given to the religious instruction by virtue of its being taught in the classroom), it is clear that the term was also considered in the geographical sense (use of tax-supported property for religious purposes).

**14.** Even if the school district does not actually sanction or support the religious activity and in reality merely tolerates it, by allowing the dissemination of religious dogma on school premises, the appearance of official sanction would be created. (See *McCollum v. Board of Education, supra* ).

**15.** Accord *Chess v. Widmar, supra; Trietley v. Board of Education,* 65 A.D.2d 1, 409 N.Y.S.2d 912 (1978); *Johnson v. Huntington Beach U. High Sch. Dist., supra.* But contra *Keegan v. University of Delaware,* 349 A.2d 14 (Del.Supr. 1975), relied upon by plaintiffs, in which the Court without analysis of the precedent concerning the "primary effect" test, found that the University could permit plaintiffs to hold regular worship services in college owned

buildings. The Court in *Keegan,* indicated that a different conclusion might have been reached if high school rather than college students had been involved since the college students actually resided on the college campus and because of age were probably less impressionable. See *Tilton v. Richardson, supra,* recognizing that college students might be less impressionable than high school students allowing perhaps a bit more leaway in deciding Establishment Clause issues.

Plaintiffs also rely upon *Reed v. VanHoven,* 237 F.Supp. 48 (W.D.Mich.1965), a case decided prior to the development of the tripartite test, in which the Court set up an intricate plan for allowing students to meet for religious purposes in school immediately prior to the commencement of the school day as an interim measure while a challenge to the school's refusal to allow such meetings was decided by the Court. This Court can find no record of the final disposition of the case, but it is obvious that implementation of the plan would have resulted in serious entanglement problems.

See e. g. *Lemon v. Kurtzman, supra*, in which a law providing for supplemental income payments to teachers who taught strictly secular courses in private schools was struck down for that reason.

Defendants in this case would also, it appears, be necessarily required to maintain continual surveillance over the plaintiffs' activities even though the plaintiffs assert that adult volunteers would supervise the meetings. The surveillance would be required to insure that attendance and participation in the meetings remained voluntary and that no pressure, no matter how subtle, was placed on other students to coerce involvement. In addition, the school officials would be forced to maintain some supervision over the meetings in order to protect the district from any liability which could result from a violation of the standard of care and supervision imposed on school officials by the laws of the State of New York. *Lauricella v. Board of Ed. of City of Buffalo*, 52 A.D.2d 710, 381 N.Y.S.2d 566 (1976).

As suggested by the Court in *Johnson v. Huntington Beach U. High Sch. Dist., supra*, 68 Cal.3d 1, 137 Cal.Rptr. at 50, allowing the students to hold prayer meetings at the school at an hour when many students are on the premises for educational purposes, could conceivably result in a serious disruption of the educational process. Any such disruption would, of course, require action on the part of school officials adding to the entanglement problem already present.

## IV.

Plaintiffs contend that even if holding prayer meetings on public school premises would result in a violation of the Establishment Clause, the refusal by the defendants to allow them to do so is in violation of their First Amendment rights to the free exercise of religion and the guarantee of the right of freedom of speech and freedom of association.

█ The Free Exercise Clause has generally been interpreted as including both the freedom to believe and the freedom to act upon those beliefs. While the former has been found to be an absolute privilege, the latter has not been accorded total freedom from legislative restriction. *Sherbert v. Verner*, 374 U.S. 398, 402–03, 83 S.Ct. 1790, 1792–93, 10 L.Ed.2d 965 (1963); *Cantwell v. Connecticut, supra*, 310 U.S. at 303–04, 60 S.Ct. at 903.

The Supreme Court in *Poulos v. New Hampshire*, 345 U.S. 395, 405, 73 S.Ct. 760, 766, 97 L.Ed. 1105 (1952) cautioned that:

The principles of the First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction. It is a *non sequitur* to say that First Amendment rights may not be regulated because they hold a preferred position in the hierarchy of the constitutional guarantees of the incidents of freedom. This Court has never so held and indeed has definitely indicated the contrary.

█ In ascertaining whether a free exercise violation is present in this situation, the Court must first determine whether the plaintiffs' right to the free exercise of religion has in fact been infringed by the defendants' actions, and if so, whether the restriction placed upon plaintiffs' religious freedom is based upon a compelling state interest. *Sherbert v. Verner, supra*.

█ As to the first determination, the Court is not convinced that the defendants' refusal to allow plaintiffs to hold prayer meetings on school premises immediately before the commencement of classes can, in light of precedent, be considered an unconstitutional infringement upon their right to the free expression of their religious beliefs. Although plaintiffs rely upon *Sherbert v. Verner, supra*, and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), their application in this case is at best limited.

In *Sherbert*, the Supreme Court found that the refusal of unemployment benefits to a Seventh Day Adventist because of her refusal to work on Saturdays, the Sabbath for adherents of that faith, was a violation

of her right to the free exercise of religion since she was, in effect, coerced into choosing between the practice of her religion and the receipt of public benefits. The Court in *Sherbert* specifically distinguished the case from those such as *Abington School Dist. v. Schempp, supra,* on the basis that it "[did] not represent that involvement of religious with secular institutions which it is the object of the Establishment Clause to forestall." 374 U.S. at 409, 83 S.Ct. at 1797.

*Wisconsin v. Yoder, supra,* in which the Supreme Court also found a Free Exercise Clause violation involved a situation in which members of the Amish faith, as a result of state compulsory education law, were put in the position of having to choose between deeply held religious convictions which prohibit public school attendance by their children after a certain age, and compliance with the law. While the Court is convinced that plaintiffs in this case are motivated by sincere religious convictions, they have failed to demonstrate that the type of coercion and infringement on the right to the free exercise of religion found in *Sherbert* and *Yoder* is present herein as a result of defendants' actions. Accord *Chess v. Widman, supra.*

The Second Circuit Court of Appeals in *Stein v. Oshinsky,* 348 F.2d 999 (2d Cir. 1965), *cert. denied,* 382 U.S. 957, 86 S.Ct. 435, 15 L.Ed.2d 361 (1965), addressed the issue of whether a school district was compelled to allow students to pray in school by virtue of the Free Exercise Clause or the guarantee of freedom of speech contained in the First Amendment.[16] In finding that no such compulsion existed, the Court explained that:

Determination of what is to go on in public schools is primarily for the school authorities. . . . The authorities acted well within their power in concluding that plaintiffs must content themselves with having their children say these prayers before nine or after three; their action presented no inexorable conflict with deeply held religious belief as in *Sherbert v. Verner, supra.* After all that the states have been told about keeping the 'wall between church and state * * high and impregnable,' *Everson v. Board of Education,* 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947), it would be rather bitter irony to chastise New York for having built the wall too tall and too strong. 348 F.2d at 1002.

The Court, in determining that refusal to allow prayers to be said in school did not violate the Free Exercise Clause or the Constitutional guarantee to the right of freedom of speech, recognized that attendance at school was compulsory, but quoting from the concurring opinion of Justice Brennan in *Abington School Dist. v. Schempp, supra,* 374 U.S. at 299, 83 S.Ct. at 1612 found that "[t]he student's compelled presence in school for five days a week in no way renders the regular religious facilities of the community less accessible to him than they are to others."[17] 348 F.2d at 1001.

Even if this Court did find that plaintiffs' free exercise rights were being violated by the defendants, the Establishment Clause mandate provides the defendants with the requisite compelling state interest in maintaining a separation between Church and State which would justify the level of infringement which could conceivably be found in this case.[18] See e. g. *Chess v. Widmar, supra.*

16. The Court in *Stein* did not decide the Establishment Clause question raised. Rather the Court assumed *arguendo* that there was no violation and decided the case on the right of the school officials to determine that no prayers would be said in school.

17. It should be noted at this point that New York State Education Law § 414, which sets forth a list of the purposes for which public school premises may lawfully be used, excludes any type of religious usage. While the statuto-

ry limitation could not stand if it resulted in undue infringement on plaintiffs' right to the free exercise of religion, the Court in *Stein* instructs that such is not the case.

18. Plaintiffs argue that there is no compelling state interest in preventing them from using school property for religious purposes during off school hours. As the Court has already explained, the time at which plaintiffs have requested permission to meet is not sufficiently removed from the official school day to be

Plaintiffs' argument that defendants' actions serve as a prior restraint on their freedom of speech must also fail. There is no question that within certain limits, students retain their fundamental constitutional rights while attending public school. *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). It is also true that there is a strong presumption against the validity of any prior restraint on speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

However, neither the fact that students retain their constitutional rights in school nor the general ban on prior restraint of speech dictates that the requirements of the Establishment Clause be disregarded. In addressing the issue of prior restraint, situations involving "religious activity" which are subject to the restriction imposed by the Establishment Clause must be looked at differently from those involving "secular liberties" where there is no such restriction and restraint is seldom allowed.[19] See *Abington School Dist. v. Schempp, supra*, 374 U.S. at 219, 83 S.Ct. at 1569, in which the Court notes the distinction between the two types of speech, and recognizes the different treatment which must be accorded each as a result of the Establishment Clause.

This Court has already discussed the fact that First Amendment rights are not absolute, and this is but another instance where the right to freedom of speech and association must be tempered by the boundaries established by the Establishment Clause. See *Poulos v. New Hampshire, supra*. See also *Stein v. Oshinsky,*

*supra*, in which the Court found no violation of the guarantee of freedom of speech in refusing to allow students to say prayers in school.

### V.

The last issue to be discussed by this Court is plaintiffs' claim that defendants, by making the Guilderland School property available to all forms of student groups during off school hours except religious groups, are denying them equal protection of the law. In support of this argument, plaintiffs rely primarily upon a series of cases involving the right to use public parks, streets and sidewalks for the dissemination of the religious dogma. See e. g. *Fowler v. Rhode Island*, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953); *Niemotko v. Maryland*, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); *Saia v. New York, supra*.

These cases must, however, be distinguished on two separate grounds. First, in *Fowler v. Rhode Island, supra*, the Court found that although an ordinance regulating the use of public parks was construed to prohibit a group of Jehovah's Witnesses from holding religious services in the park, there was evidence presented that other religious groups were allowed such use. Plaintiffs in this case make no claim that other religious groups have been allowed use of the school premises immediately prior or to the commencement of classes or any other time. In fact, Education Law § 414 would clearly serve to prohibit such use.

Second, for the purpose of application of the Establishment and Free Exercise Clauses, there is a substantial difference between public streets, sidewalks and

considered off school hours for the purpose of determining an Establishment Clause violation.

**19.** Plaintiffs rely primarily upon cases involving prior restraint on political speech. See e. g. *Police Department of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971), in which the Court did not have to balance the right to freedom of speech against the restrictions imposed by the Establishment Clause. Nor is the case controlled by cases

such as *Saia v. New York*, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948), which although dealing with an allegation of a denial of the right to freedom of religious speech, struck down a statute regarding the granting of permission for use of an amplification system not because of the restraint on religious freedom of speech but because it in general gave complete discretion on granting of permission to the chief of police without setting forth specific standards for the granting of permission.

parks and public buildings, especially schools which are normally associated with state sanctioned instruction and, therefore, probably more susceptible to Establishment Clause violations. The Supreme Court in *Saia v. New York, supra,* a case involving a challenge to an ordinance requiring the approval of the Chief of Police for the use of a loudspeaker system on public streets, by a Jehovah's Witness who had been denied permission, recognized that liberal use of public parks, streets and sidewalks was favored. Quoting from *Hague v. C. I. O.,* 307 U.S. 496, 514–16, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939), the Court stated that:

> Wherever the title of streets and parks may rest, they have been immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied. 334 U.S. 561, n.2, 68 S.Ct. 1150.

■ In its decision, the majority rejected the argument posed by Justice Jackson in his dissenting opinion, that *McCollum v. Board of Education, supra,* in which the Court had found that use of public school premises for religious purposes violated the Establishment Clause, was controlling in a public park type situation. The present case, of course, falls within the stricter rule of *McCollum v. Board of Education, supra,* rather than the more liberal rule applied in the public park cases. Because the defendants' decision not to allow plaintiffs to hold

prayer meetings on school property is mandated by the Establishment Clause and is not an arbitrary or unwarranted act of discrimination, plaintiffs are not being denied equal protection of the law under the Fourteenth Amendment to the Constitution.

## VI.

Having found that defendants were correct in denying plaintiffs use of a school room for prayer meetings immediately prior to the commencement of classes on the basis of the restrictions imposed by the Establishment Clause, and having further conceded that plaintiffs' allegations of denial of their rights to the free exercise of religion, freedom of speech and association and equal protection of the law in no way compel a different result, the Court must deny plaintiffs' motion for summary judgment since they are not entitled to the declaratory, injunctive or monetary relief sought herein as a matter of law.

■ Although defendants have not made a formal cross-motion for summary judgment, this Court is empowered to search the record and if warranted to grant summary judgment in defendants' favor. *Procter & Gamble Ind. U. v. Procter & Gamble Mfg. Co.,* 312 F.2d 181, 190 (2d Cir. 1962), *cert. denied,* 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963). Having determined that there are no issues of material fact which preclude summary judgment in this action and having concluded that defendants' actions have not resulted in the violation of plaintiffs' rights to the free exercise of religion, freedom of speech and association or equal protection of the laws, as alleged by plaintiffs in their complaint, the Court is compelled to grant summary judgment in favor of the defendants and hereby dismisses plaintiffs' complaint in its entirety.[20] While this Court is not comfortable with the result in this case, which will preclude a group of sincere young people from gathering together for religious purposes, it is, in the Court's opinion, mandated

---

**20.** Since plaintiffs' complaint is being dismissed, it is not necessary to discuss defendants' assertion that the Commissioner of Education is a necessary party.

**1234**

by the presently controlling First Amendment cases.

IT IS SO ORDERED.